UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MYLES DAVIS, an individual, and JANELLE DAHL, an individual,<br><br>    Plaintiffs,<br><br>        v.<br><br>BLAST PROPERTIES, INC. dba B&B CUSTOM HOMES, an Idaho corporation, and TYLER BOSIER, an individual,<br><br>    Defendants. | Case No. 1:21-cv-00218-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is the Motion for Partial Summary Judgment filed by Plaintiffs Myles Davis and Janelle Dahl. Dkt. 16. The Court heard oral argument on November 1, 2021. For the reasons explained below, the Court will grant the motion in part and deny the motion in part.

## BACKGROUND

The dispute in this case centers on a combined contract for real estate and construction. A review of parties' history places the present motion in its necessary context.

**MEMORANDUM DECISION AND ORDER - 1**

In the Summer of 2020, Plaintiffs Myles Davis and Janelle Dahl contacted
Defendant Tyler Bosier,[1] president of Co-Defendant Blast Properties, Inc. d/b/a
B&B Custom Homes, about building a new home. Dkt. 22-2 at 2. The record
shows that the parties amicably worked through the design phase of the project and
eventually completed preliminary plans for the home. *See* Dkt. 22-6 (discussing
preliminary plans). Friction first arose when Mr. Davis and Ms. Dahl notified Blast
that they could not enter a contractual agreement without substantially reducing the
project's budget. *See* Dkt. 22-8; Dkt. 22-7. Mr. Davis and Ms. Dahl consequently
removed certain features that had been set out in the preliminary plans. *See* Dkt.
22-8; Dkt. 22-7; Dkt. 22-10 (identifying home features removed and including
final plans).

Blast eventually sent final plans to Mr. Davis and Ms. Dahl's agent. Dkt. 22-
11. But the final plans did not include a new electrical plan that reflected the
budget-reducing changes. Instead, the final plans consisted of the preliminary
electrical plans overlayed with Mr. Davis's handwritten annotations that attempted
to explain which features they wanted to remove. Dkt. 22-11 at 54. Mr. Bosier, on
behalf of Blast, approved these final plans by initialing each page included in the

---

[1] While Mr. Bosier was initially named in the Complaint, *see* Dkt. 1, the present motion
pertains only to Blast, Dkt. 16 at 2.

**MEMORANDUM DECISION AND ORDER - 2**

final contract. Dkt. 22-12 at 35–48.

In early December 2020, the parties signed an RE-22 Pre-Sold New Construction Real Estate Purchase and Sale Agreement along with Addendum 1, the final building plans, and a warranty (all collectively referred to as the "Initial Agreement"). Dkt. 22-12. Several provisions of the Initial Agreement later proved relevant to the parties' dispute. First, the Initial Agreement identifies $59,000 as "additional nonrefundable consideration" that Mr. Davis and Ms. Dahl would pay upfront. Dkt. 22-12 at 2. Next, the Initial Agreement provides stucco exterior for the home.  Dkt. 22-12 at 50; *see also* Dkt. 16-16 at 1–2 (explaining issue related to stucco exterior). Additionally, the Initial Agreement requires any modification to be in writing and signed by each of the parties. Dkt. 22-12 at 6. Finally, the Initial Agreement has a fixed purchase price, meaning the $615,000 purchase price includes "all labor and materials furnished and work performed by [Blast]." Dkt. 22-12 at 11. In practice, this meant that Blast bore the burden or received the benefit of any increases or decreases in labor or material costs during the home's construction. *See* Dkt. 22-12 at 11; Dkt. 22-1 at 3–4.

On January 11, 2021, the parties executed Addendum 2 (collectively referred to along with the Initial Agreement as the "Contract"). Dkt. 22-13. Addendum 2 provided that the initial $2,500 earnest money and the additional

$59,000 would be combined for a total of $61,500 and be "released to [Blast] immediately as non-refundable for any reason." Dkt. 22-13. Blast characterizes this $61,500 as a deposit to cover up-front construction costs. Dkt. 22-1 at 3; *see also* Dkt. 22-12 at 11 (requiring ten percent down payment of purchase price). The funds released by Addendum 2, in conjunction with Mr. Davis and Ms. Dahl satisfying documentation of loan commitment, triggered Blast's obligation to begin work on the home. Dkt. 22-12 at 12.

But Blast did not begin construction until sometime in late March or early April 2021. *See* Dkt. 24-2 at 3. During this time Mr. Bosier became concerned about the rising cost of building materials, particularly lumber. Dkt. 22-2 at 4. Mr. Bosier was also concerned that the Contract did not set out clear electrical and plumbing plans for the pool that was initially planned, and later removed. Dkt. 22-2 at 4. According to Mr. Bosier, these concerns led to a new proposed addendum to the Contract ("Proposed Addendum 3"), which he sent to Mr. Davis and Ms. Dahl. Dkt. 22-2 at 4.

At this point the parties' relationship began to unravel. Much of the present dispute stems from Proposed Addendum 3. On April 15, 2021, Blast's agent sent Proposed Addendum 3 to Mr. Davis and Ms. Dahl's real estate broker, Dan Allen. Dkt. 16-15 at 1. The document contains five proposed items:

**MEMORANDUM DECISION AND ORDER - 4**

(1) Buyer & Seller understand and agree that Seller will not be installing heated flooring and there are no plumbing and/or electrical upgrades for a pool.

(2) Electrical sketch from client is not a part of the building plans and/or contract. Any extras or requests from Buyer to be handled via change orders. This includes any electrical upgrades for this property outside of the initial budget, which are to be requested by Buyer to Seller and addressed through the Seller's change order process.

(3) Buyer understands the lumber and pre-engineered trusses costs have increased a total overage to date of $13,888 (Thirteen Thousand, Eight Hundred Eighty-Eight and 00/100 Dollars). This increased cost amount to be added to the Purchase Price.

(4) New Purchase Price, including cost increases =$628,888 (Six Hundred Twenty-Eight Thousand, Eight Hundred Eighty-Eight and 00/100 Dollars).

(5) Buyer to deliver an updated preapproval letter to Seller within 3 business days of full execution of this Addendum.

Dkt. 22-14 at 1. Plaintiffs argue that in proposing this addendum, Blast asked to do less work for more money—removing heated floors and electrical upgrades and increasing the contract price to account for rising material prices. Dkt. 16-2 at 2. Blast basically agrees, stating that the plumbing and electrical upgrades for the pool was a contract clarification while "the other changes were requests for contract modifications in order to adjust for various cost increases Blast was facing on this project." Dkt. 22-2 at 4.

Hours after receiving the proposed addendum on April 15, 2021, Mr. Davis

emailed Mr. Bosier to inquire about Proposed Addendum 3. Dkt. 22-15 at 2.

Separately, Mr. Allen asked Seller's real estate agents via email the same day "[i]f

my client does not agree to these changes requested by the builder, what will be the

builder's response?" Dkt. 16-15 at 1. Four days later, on April 19, 2021, Mr.

Bosier responded, explaining that he had been on a family vacation and would

have addressed their concerns sooner had he seen the email. Dkt. 22-15 at 1. Mr.

Davis replied, expressing his concerns about Mr. Bosier's delayed response,

especially considering none of the $61,500 deposit remained in escrow. Dkt. 22-15

at 1.

In further response to Proposed Addendum 3, Plaintiffs' attorney, Peter

Singler, sent a letter to Mr. Bosier demanding assurance that Blast would perform

its obligations under the Contract. Dkt. 16-4. Singler underscored Plaintiffs'

concerns: "based on the slow commencement of construction, and this attempt to

increase the Contract price and reduce the scope without justification, my clients

are very concerned that you will not be able to perform under the Contract." Dkt.

16-4. This letter was forwarded via email to Mr. Bosier's attorney, Wyatt Johnson.

Dkt. 22-16 at 1. During the attorneys' correspondence, Mr. Singler suggested on

two occasions that the $61,500 deposit be returned to escrow while the parties

sorted out their dispute over Proposed Addendum 3. Dkt. 22-17 at 3. Mr. Johnson

instead proposed the parties meet to resolve their dispute. Dkt. 22-17 at 2. The

email string ends with Mr. Davis stating he and Ms. Dahl understood the $61,500

being put back in escrow was "not going to happen." Dkt. 22-17 at 1. Still, Mr.

Davis reiterated he and Ms. Dahl would "like some assurances the house will be

built" and hoped the parties would be able to meet in the coming days. Dkt. 22-17

at 1.

The parties met, but the discussion was not fruitful. Dkt. 22-2 at 5. Several

days later, Mr. Bosier emailed Mr. Davis with further suggestions about a path

forward. Dkt. 16-16 at 2–3. The parties' attorneys and real estate agents were

copied on the email, but Ms. Dahl's personal email was inadvertently omitted. Dkt.

16-16 at 2–3; Dkt. 22-2 at 5. In his email, Mr. Bosier explains that he sent over "an

addendum for a materials increase." Dkt. 16-16 at 2. Mr. Bosier further explained

that

> If you [Mr. Davis] do not wish to pay this materials increase I
> understand but I will be forced to absorb your lumber increases and
> only follow our standard specs for your home and design of your home.
> In doing so I will not allow any upgrades, change orders or special
> requests on your project due to limited resources and time to
> accommodate your special requests. We need to come to a final
> resolution on your pricing for materials increases and your electrical
> requests.

Dkt. 16-16 at 2–3. Mr. Bosier went on to suggest that Mr. Davis perform the

electrical work on the home and supply the materials and labor to do so. Dkt. 16-16

MEMORANDUM DECISION AND ORDER - 7

at 3. In exchange, Mr. Bosier would "eat the lumber upgrades." Dkt. 16-16 at 3.

Mr. Bosier also requested Mr. Davis' input on "our best path forward to get you

the extras and special requests you want as well as help me to offset the extra costs

we are experiencing in this market." Dkt. 16-16 at 3. He reiterated, however, that

Blast could not "absorb [the] extra materials costs and accommodate [Mr. Davis

and Ms. Dahl's] upgrades at the same time." Dkt. 16-16 at 3.

In response, Mr. Davis provided his own suggestions, including "three

options" that he felt would determine how the parties proceeded (the "Davis

Email"). Dkt. 16-16 at 1–2. Critical here, Mr. Davis' third option stated:

> Three: you return our $61,500.00 and we move to another development.
> This does not cover the last 9 months of meetings and work we have
> put in and is devastating to us but We interviewed you with certain
> goals and now the most important you want to delete. The electric and
> warm floors don't even touch this issue. $61500.00 Would need to be
> returned immediately as we keep losing money with this project. (sic)

Dkt. 16-16 at 1–2. Forty-five minutes later, Mr. Bosier responded: "I am

instructing First American Title, Shaun Urwin & Lisa Cunningham with Better

Homes and Gardens Real Estate and my office to cancel our transaction per your

option three and return your earnest money immediately." Dkt. 22-18 at 1. Just

after, Sarah Harper—the Escrow Officer copied on the email chain— requested an

"executed cancellation" so the $61,500 could be returned. Dkt. 22-18 at 1.

Plaintiffs' agent then received an RE-20 Contract Termination and/or Release of

Earnest Money ("RE-20") signed by Mr. Bosier. Dkt. 16-18; Dkt. 16-19. The

RE-20 contained separate signature lines for Mr. Davis and Ms. Dahl. Dkt. 16-19.

After the $61,500 was returned to escrow, Mr. Singler instructed the Escrow

Officer to hold the funds pending instructions from the parties. Dkt. 16-7 at 1. The

Escrow Officer informed Mr. Singler that once the RE-20 was returned, the funds

would be released. Dkt. 16-7 at 1. Neither Mr. Davis nor Ms. Dahl ever signed the

RE-20, Dkt. 24-1 at 3; Dkt. 16-3 at 3, and the $61,500 remains in escrow, *see* 16-1

at 5; Dkt. 22-1 at 5–6.

     The following day, Mr. Davis emailed Mr. Bosier. *See* 16-22 at 1. He stated

that delivering the $61,500 back to escrow "does not remedy everything." Dkt. 16-

22 at 1. Mr. Davis asserted that, if he and Ms. Dahl moved to another development,

Blast would be responsible for any cost increase incurred to build a comparable

home. Dkt. 16-22 at 1. Later that day, Mr. Johnson, on behalf of Mr. Bosier and

Blast, emailed Mr. Singler to inform him that Blast considered the Davis Email a

settlement of the issues surrounding the Contract. Dkt. 16-5 at 2. He further

explained that "Blast will not take a different position than that with respect to the

past contract." Dkt. 16-5 at 2. Soon thereafter, Mr. Davis and Ms. Dahl initiated

this action against Blast and Mr. Bosier alleging several causes of action. Dkt. 1 at

1–10. Mr. Davis and Ms. Dahl have moved for summary judgment of (1) their First

Cause of Action for Specific Performance, (2) the issue of Blast's alleged breach by repudiation, and (3) Blast's Sixth Affirmative Defense related to the alleged settlement agreement. Dkt. 16 at 2.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. A "genuine issue" of material fact arises if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Additionally, "[w]here, as here, the case turns on a mixed question of fact and law and the only disputes relate to the legal significance of undisputed facts, the controversy collapses into a question of law suitable to disposition on summary judgment." *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1045–46 (9th Cir. 2002) (internal citations omitted).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)-(B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir.

2003).

If the moving party makes the required initial showing, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court may grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P.

56(e)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630–31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

## ANALYSIS

Mr. Davis and Ms. Dahl seek summary judgment on Defendant's Sixth Affirmative Defense, the issue of Blast's alleged breach by repudiation, and their First Cause of Action for Specific Performance. The Court will address each in turn.

### A.    Sixth Affirmative Defense

In opposition to Plaintiffs' motion for partial summary judgment, Blast argues that the parties have already settled the claim. Blast contends "[i]n determining whether there is a compromise, all that matters is that there was a dispute." Dkt. 22 at 3. Blast is right that Idaho courts do not look to whether a plaintiff could maintain an action when evaluating a settlement agreement, but the existence of a dispute is not "all that matters." *See Wilson v. Bogert*, 347 P.2d 341,

345 (Idaho 1959).

In a diversity action, the Court interprets a contract under applicable state law. *Farina v. Mt. Bachelor, Inc.*, 66 F.3d 233, 235 (9th Cir. 1995). In Idaho, "[a] settlement agreement 'stands on the same footing as any other contract and is governed by the same rules and principles as are applicable to contracts generally.'" *Hoffman v. Bd. of Local Improvement Dist. No. 1101,* 415 P.3d 332, 337 (Idaho 2016) (quoting *Vanderford Co. v. Knudson*, 249 P.3d 857, 865 (Idaho 2011). To be enforceable, "[a] contract must be complete, definite and certain in all its material terms, or contain provisions which are capable in themselves of being reduced to certainty." *Giacobbi Square v. PEK Corp.*, 670 P.2d 51, 53 (Idaho 1983); *see also Wood v. Simonson*, 701 P.2d 319, 321 (Idaho Ct. App. 1985). "An enforceable contract must contain the essential terms of agreement and not be too vague, indefinite, or uncertain as to those terms." *Silicon Int'l Ore, Ltd. Liab. Co. v. Monsato Co.*, 314 P.3d 593, 602 (Idaho 2013) (citing *Dale's Serv. Co., Inc. v. Jones*, 534 P.2d 1102, 1105 (Idaho 1975), *Lawrence v. Jones*, 864 P.2d 194, 197 (Idaho Ct. App. 1993), and 1 Arthur L. Corbin, Corbin on Contracts § 4.1 (rev. ed. 1993) ("A court cannot enforce a contract unless it can determine what it is")). The threshold question of whether a contract is facially complete is a question of law

for the court.[2] *Dante v. Golas*, 823 P.2d 183, 186 (Idaho Ct. App. 1992) ("The

question whether an agreement is complete in all of its material terms is a question

of law over which we exercise free review."); *see also Wood v. Simonson*, 701

P.2d 319, 321 (Idaho Ct. App. 1985); *Hoffman v. Bd. of Local Improvement Dist.*

*No. 1101*, 415 P.3d 332, 337 (Idaho 2016); *Chapin v. Linden*, 162 P.3d 772, 775

(Idaho 2007).

　　To determine whether a contract is complete, Idaho courts look to the type

of agreement in determining what are essential, material terms[3] for both that *type*

*of* contract and that *specific* contract between the parties. *See, e.g.*, *Ogden v.*

*Griffith*, 236 P.3d 1249, 1256 (Idaho 2010) ("[T]he Court found that those terms

were essential terms to that particular agreement, not all agreements for real

estate."). *See also Dante v. Golas*, 823 P.2d 183, 186 (Idaho Ct. App. 1992) (lease

option contract); *Shore v. Peterson*, 204 P.3d 1114, 1120 (Idaho 2009) (accord and

---

[2] The threshold question of completeness is also important to the scope of the Court's equitable powers. As the Ninth Circuit has stated, "[i]t is well settled that a district court has the equitable power to enforce summarily an agreement to settle a case pending before it." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987) (collecting cases). "However, the district court may enforce only *complete* settlement agreements." *Id.* at 890 (citing *Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983) and *Gardiner v. A.H. Robins Co.*, 747 F.2d 1180, 1189 (8th Cir. 1984)).

[3] Idaho courts appear to use *material* and *essential* interchangeably in this context. *See, e.g.*, *Tricore Invs. Ltd. Liab. Co. v. Estate of Warren*, 485 P.3d 92, 111 (Idaho 2021) (concluding that the contract at issue contained "all the essential material terms of a land sale contract").

satisfaction); *Wood v. Simonson*, 701 P.2d 319, 321 (Idaho Ct. App. 1985) (earnest money agreement).

For example, in *Lettunich v. Key Bank National Association*, the Idaho Supreme Court evaluated the essential terms for the type of contract, an oral loan agreement. 109 P.3d 1104 (Idaho 2005). The court found that there was "no evidence in the record of a complete and enforceable [loan] agreement." *Id.* at 1109. In particular, the court noted there was "no indication of the amount of the loan, the interest rate, the disbursement schedule, the terms of repayment, the security for the loan, or the parties' rights after default." *Id.* The court did not indicate that the absence of any single term was dispositive. Rather, the court concluded that "the lack of all of them in this case makes the oral agreement to lend money vague, incomplete and unenforceable." *Id.*

Moreover, in *Chapin v. Linden*, after evaluating the essential terms for the type of agreement, a real estate purchase agreement, the Idaho Supreme Court evaluated the essential terms for the specific agreement between the parties. 162 P.3d 772 (Idaho 2007). While the agreement contained all the essential terms for that type of contract, the court found the contract lacked essential terms to the specific agreement between the parties—namely a security provision. *Id.* at 776. "Although a real estate contract need not contain a security provision if none is

contemplated, once parties attempt to provide for security it becomes an essential term of the contract." *Id.* (citing *Lawrence*, 864 P.2d at 197).

Under Idaho law a contract can fail for completeness in at least two ways. *See Silicon Int'l Ore, Ltd. Liab. Co.*, 314 P.3d at 602 ("An enforceable contract must contain the essential terms of agreement and not be too vague, indefinite, or uncertain as to those terms."). When the law requires a specific *type* of agreement to contain certain essential terms, or when the parties have contemplated specific terms for their particular agreement, lack of such terms leaves the contract facially incomplete. *Chapin*, 162 P.3d at 775–76. Although Idaho courts often enumerate *some* specific essential terms for a given type of agreement, the courts typically do not provide an exhaustive list of *all* the essential terms for that type of agreement.[4] Instead, Idaho courts, alongside numerous other jurisdictions, often employ a "sufficiently complete to be enforceable" standard. *See infra* Section A.2. In essence, the Court looks at whether it can determine the rights and obligations to a basic

---

[4] *See Lettunich v. Key Bank Nat'l Ass'n*, 109 P.3d 1104, 1109 (Idaho 2005) ("While none of these terms individually may be determinative, the lack of all of them [make the agreement] vague, incomplete and unenforceable."); *Bauchman-Kingston P'ship, LP v. Haroldsen* , 233 P.3d 18, 22 (Idaho 2008) (emphasis added) ("At a minimum, land sale contracts must typically specify the parties involved, the subject matter thereof, the price or consideration, a description of the property and *all other essential terms* of the agreement.").

degree of enforceability from the face of the agreement. *Id.* If such rights and obligations cannot be determined, there is no enforceable agreement. *Id.*

Here, to rule on Mr. Davis and Ms. Dahl's motion for adjudication of Blast's Sixth Affirmative Defense, the Court must determine as a matter of law whether the Davis Email is facially complete as a settlement agreement in all essential and material terms. The Davis Email fails as a settlement agreement for at least two reasons.[5] First, the Davis Email fails for lack of a specific essential term enumerated under Idaho law. Second, the Davis Email fails because it is not sufficiently complete to be enforceable.

### 1. Lack of Essential Terms

The Davis Email is incomplete because it lacks a specific, essential term for this type of contract: namely, there is no provision for acceptance "in satisfaction

---

[5] Although either ground is sufficient to support the Court's ruling, there is third option: the Court could find that there is no settlement agreement. In its Answer, Blast does not contend that Mr. Bosier's email back to Mr. Davis was an acceptance. Instead, Blast asserts that the Davis Email was an offer which Mr. Bosier accepted through partial performance "by payment of such funds to Plaintiffs." Dkt. 11 at 5. However, Bosier did not pay such funds to Plaintiffs. Instead, he returned the money into escrow and completed a RE-20 Termination Agreement that was sent to Davis and Dahl. As Blast notes in footnote 2 of its brief, "a valid tender requires that a debtor produce money and place it in the control of the creditor." *Fed. Land Bank v. Parsons*, 777 P.2d 1218, 1223 (Idaho Ct. App. 1989) (citing *International Industries, Inc. v. United Mortgage Co.*, 606 P.2d 163, 166 (Nev. 1980)). The money would not be released from escrow without Davis and Dahl executing the RE-20. Dkt. 16-7 at 1. But determining whether Mr. Bosier's response email was actually a counteroffer would be superfluous to the Court's decision. In the interest of judicial restraint, the Court will not address the issue.

of a claim" or as "substitution for and extinguishment of the existing claim."

Idaho courts have treated settlement agreements with some degree of legal technicality. Idaho law characterizes a settlement agreement as either an "executory accord" [6] or a "substituted contract." *World Wide Lease v. Woodworth*, 728 P.2d 769, 774 (Idaho Ct. App. 1986). An executory accord is "a compromise which provides for the acceptance in the future of a stated performance in satisfaction of the claim." *Id.* at 774 (internal citations and quotations omitted). In contrast, a substituted contract is a compromise agreement that "is accepted as a substitution for and extinguishment of the existing claim" *Id*. Importantly, in either scenario, "the acceptance and acquiescence of both parties must be clearly and unequivocally expressed." 15B Am Jur 2d *Compromise and Settlement* § 8; *see also Lawrence v. Hutchinson*, 204 P.3d 532, 540 (Idaho Ct. App. 2009) (finding that a representation to the district court that the parties had reached an "agreement

---

[6] "Accord and satisfaction is a method of discharging a contract or cause of action, hereby the parties agree to give and accept something in settlement of the claim or demand of the one against the other, and perform such agreement, the 'accord' being the agreement and the 'satisfaction' its execution or performance." *Fairchild v. Mathews*, 415 P.2d 43, 46 (Idaho 1966), *abrogated on other grounds by statute*, Idaho Code § 28-3-310. "[An accord is an] offer to give or to accept a stipulated performance in the future to satisfy an obligor's existing duty, together with an acceptance of that offer. The performance becomes what is known as a *satisfaction.* — Also termed *executory accord* . . . . 'The term *executory accord* is sometimes used to underscore the point that the accord itself does not discharge the duty.'" *Accord*, *Black's Law Dictionary* (11th ed. 2019) (citing E. Allan Farnsworth, *Contracts* § 4.24, at 289 n.10 (3d ed. 1999).

in principle" was "not an unconditional statement of agreement."). Moreover, the Idaho Supreme Court has stated that the "essential elements" in prima facie case for an accord and satisfaction include "an agreement between plaintiff [and] defendants . . . and its acceptance by the plaintiff *as and for full satisfaction of defendants' obligation . . . .*" *Conklin v. Patterson*, 379 P.2d 428, 431 (Idaho 1963) (emphasis added). [7]

In the present case, there is no accord because there is no provision for acceptance in satisfaction of the claim. Here, a stipulation that in some manner extinguishes the claim, right, or original contract is an essential term for an accord. *See Harris v. Wildcat Corp.*, 556 P.2d 67, 69 (Idaho 1976) (characterizing an accord as consisting of a "stipulation[] . . . to extinguish an existing obligation" ). But the Davis Email does not contain any covenant not to sue, waiver of claim, release of claims, or any other mechanism that stipulates to the extinguishment of either the existing obligation or possible cause of action. Dkt. 16-11 at 2. Without

---

[7] While an accord and satisfaction can be "implied from the attendant circumstances," *Harris v. Wildcat Corp.*, 556 P.2d 67, 69 (Idaho 1976), that was not plead here. Instead, Blast asserted the Davis Email was an express offer that was accepted by Blast. Even still, the attendant circumstances support the conclusion that there was no settlement reached by the parties. *See, e.g.*, Dkt. 16-17 at 2 ("I [Mr. Bosier] am instructing First American Title, Shaun Urwin & Lisa Cunningham with Better Homes and Gardens Real Estate and my office *to cancel our transaction* per your option three and return your earnest money immediately." (emphasis added)); Dkt. 16-22 at 1 (Davis' email responding to the RE-20).

such a stipulation, the Davis Email fails as an accord.

The Davis Email also fails as a substituted contract. Idaho law provides that a new contract can become a substituted contract with "the effect of complete recission" if it (1) "explicitly rescind[s] the earlier contract," (2) "deal[s] with the subject matter of the former contract so comprehensively as to be complete within itself and to raise the legal inference of substitution," or (3) "present[s] such inconsistencies with the first contract that the two cannot in any substantial respect stand together." *Silver Syndicate v. Sunshine Mining Co.*, 611 P.2d 1011, 1020 (Idaho 1979). Additionally, to serve as a compromise agreement, the contract must be "*accepted as a substitution for and extinguishment of the existing claim . . . .*" *World Wide Lease v. Woodworth*, 728 P.2d 769, 774 (Idaho Ct. App. 1986) (internal citations omitted) (emphasis added).

Here, the Davis Email does not provide for acceptance "as substitution for and extinguishment of the existing claim." The Davis Email does not state that the purported offer substitutes for the previous contract or extinguishes a claim for any breach. Instead, Mr. Davis suggested that Mr. Bosier "return our $61,500.00 and we move to another development. This does not cover the last 9 months of meetings and work we have put in and is devastating to us but We interviewed you with certain goals and now the most important you want to delete" (sic). Dkt. 16-

16 at 1–2. Mr. Davis did not indicate that he and Ms. Dahl[8] would refrain from bringing a claim against Blast. Without a provision stipulating to the substitution and extinguishment of an existing claim or obligation, at best this was an invitation to negotiate that left material terms open for future negotiations.[9] *See, e.g.*, *Brunobuilt, Inc. v. Strata, Inc.*, 457 P.3d 860, 869 (Idaho 2020) ("No enforceable contract comes into being when parties leave a material term for future negotiations, creating a mere agreement to agree." (citing *Spokane Structures, Inc. v. Equitable Inv., LLC*, 226 P.3d 1263, 1268 (Idaho 2010))). Since the Davis Email does not have such a stipulation, it fails as a substituted contract.

-----

[8] The parties argue extensively over whether Mr. Davis acted with apparent authority when he purportedly settled both his and Ms. Dahl's claims in the Davis Email. *See* Dkt. 20 at 8–9; Dkt. 28 at 3–6. The parties appear to have overlooked Idaho authority holding that an agent must act with *actual* authority—either express or implied—to settle a principal's claim. *Caballero v. Wikse*, 92 P.3d 1076, 1079 (Idaho 2004) ("[T]he doctrine of apparent authority is inapplicable if the action taken by the agent is compromising the principal's claim. Rather, an agent needs actual authority, express or implied actual authority, to compromise a principal's claim." (internal citations omitted). Nonetheless, the Court will not address this issue because the Davis Email is unenforceable as a settlement agreement.

[9] To be clear, the Court does not adopt a position on Mr. Davis' intent. That would be improper on this motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). Regardless of Mr. Davis' true intent, the alleged express settlement agreement, which consists only of the terms in the Davis Email, is incomplete, and thus unenforceable, without all the essential terms—namely, without a clear and unequivocal expression stipulating that the agreement extinguishes or substitutes an existing right or obligation.

**MEMORANDUM DECISION AND ORDER - 22**

## 2. Vagueness, Indefiniteness, and Uncertainty.

Without the essential terms for either an executory accord or a substituted contract, this settlement agreement fails as incomplete. Completeness, however, is a coin with two sides: "An enforceable contract must contain the essential terms of agreement and not be too vague, indefinite, or uncertain as to those terms." *Silicon Int'l Ore, Ltd. Liab. Co.*, 314 P.3d at 602. The Davis Email is not sufficiently complete for this Court to enforce—namely the terms, as presented, are too vague, indefinite, and uncertain.

To be complete a "contract must contain the essential terms of agreement and not be too vague, indefinite, or uncertain as to those terms." *Silicon Int'l Ore, Ltd. Liab. Co.*, 314 P.3d at 602. In other cases where Idaho courts must address the issue of completeness without any case law on point, they turn to American Jurisprudence for guidance. *See, e.g.*, *Dante v. Golas*, 823 P.2d 183, 186 (Idaho Ct. App. 1992) (citing 71 Am. Jur. 2d *Specific Performance* § 143 (1973)); *Shore v. Peterson*, 204 P.3d 1114, 1120 (Idaho 2009) (citing 1 Am. Jur. 2d *Accord and Satisfaction* § 5 (1994)). American Jurisprudence is also helpful, here, in determining whether a settlement agreement is complete, definite, and certain. American Jurisprudence provides, in relevant part:

> To be valid and enforceable, a settlement agreement, like any other contract, must be reasonably definite and certain in its material

terms and conditions, and the acceptance and acquiescence of both parties must be clearly and unequivocally expressed. If there is uncertainty as to the terms of a settlement, the court should hold a hearing to determine if an enforceable settlement exists.

As long as a settlement agreement contains sufficient terms to determine the parties' obligations and provide the court with a certain basis for determining a remedy, there is no requirement that all disputed issues between the parties be solved. However, if the parties intend to leave some claims or issues open and unsettled, their intent should be made manifest.

15B Am Jur 2d *Compromise and Settlement* § 8. The section's predicate—"[a]s long as a settlement agreement contains sufficient terms to determine the parties' obligations and provide the court with a certain basis for determining a remedy"— is a workable rule to determine whether a settlement agreement is facially complete, definite, and certain. *Id.* Importantly, this rule is also consistent with Idaho law and how Idaho courts have evaluated definiteness and completeness in other contexts.[10]

---

[10] For example, in *Giacobbi Square v. PEK Corp.*, the Idaho Supreme Court characterized an issue on appeal as whether a renewal clause was "sufficiently complete to be enforceable . . . ." 670 P.2d 51, 53 (1983). Other cases confirm that the question of completeness is whether it provides the substance needed for the court to enforce it. *See Black Canyon Racquetball Club v. Idaho First Nat'l Bank, N.A.*, 804 P.2d 900, 902 (Idaho 1991) ("In Giacobbi Square v. Pek Corporation, 105 Idaho 346, 670 P.2d 51 (1983), we reaffirmed the well-established rule that the terms of a contract must be sufficiently definite and certain in order to be enforceable. Applying this rule to the facts of this case, we conclude that the terms of the alleged contract are too indefinite to be legally enforceable." (internal citations omitted)); *Silicon Int'l Ore, Ltd. Liab. Co. v. Monsato Co.*, 314 P.3d 593, 602 (Idaho 2013) ("A court cannot enforce a contract unless it can determine what it is.") (quoting 1 Arthur L. Corbin, Corbin on Contracts § 4.1 (rev. ed. 1993)).

Here, the parties agree that the Davis Email is the entire expression of the issue in this case. *See* Dkt. 22 at 5–6; Dkt. 16-1 at 10–11. That is, neither party asserts there is parol evidence, or other extemporaneous evidence, that should be considered to better understand the agreement. *See* Dkt. 22 at 5–6; Dkt. 16-1 at 10–11. Such circumstances render this issue fit for the Court's determination on summary judgment. *See Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1045–46 (9th Cir. 2002); *see also Dante v. Golas*, 823 P.2d 183, 186 (Idaho Ct. App. 1992) (stating that the issue of facial completeness is a question of law).

At end, Blast wants to enforce the Davis Email, but the email does not tell the Court what to enforce. As previously discussed at length, there is no waiver of claims, release of claims, covenant not to sue, or any other expression extinguishing a right to bring a cause of action that this Court could enforce against the Mr. Davis and Ms. Dahl. Even if the Court were to surmise that the Davis Email is an offer to terminate the Contract, such a supposition would also fail as a matter of law because the Contract requires any modification to be in writing

**MEMORANDUM DECISION AND ORDER - 25**

signed by all the parties.[11] Dkt. 22-12 at 6.

As such, the Court concludes that the Davis Email does not contain "sufficient terms to determine the parties' obligations and provide the court with a certain basis for determining a remedy," 15B Am Jur 2d Compromise and Settlement § 8, and is not "complete, definite and certain in all its material terms, or contain provisions which are capable in themselves of being reduced to certainty" as a settlement agreement. *Giacobbi Square v. PEK Corp.*, 670 P.2d 51, 53 (Idaho 1983). Accordingly, the Court will grant Plaintiff's motion for summary judgment on Defendant's 6th affirmative defense.

## B.    Repudiation

Mr. Davis and Ms. Dahl have moved for summary judgment on the issue of Blast's breach by repudiation. Dkt. 16 at 2. According to Plaintiffs, Blast repudiated the Contract in two ways: first, by failing to provide adequate assurance of performance, and second, by unequivocally refusing to perform its obligation under the Contract. Dkt. 16 at 2. The Court will grant Plaintiffs' motion only as to

---

[11] The Court recognizes that, in Idaho, a clause requiring modification in writing may be waived. *Idaho Migrant Council v. Nw. Mut. Life Ins. Co.*, 718 P.2d 1242, 1244 (Idaho Ct. App. 1986). But the Contract requires that any modification, such as a termination, be in writing *and* signed by all the parties. Dkt. 22-12 at 6. Moreover, Blast has not argued or alleged that this right under the Contract was waived.  Therefore, the Contract could be modified only by a writing that is signed by all the parties.

the latter.

### 1.  Failure to Provide Adequate Assurances

Plaintiffs are not entitled to summary judgment on the issue of Blast's

failure to provide adequate assurance because Idaho has not adopted this doctrine

outside the UCC context. The adequate assurance doctrine is a species of

anticipatory repudiation not generally available at common law. *See generally*

Keith A. Rowley, *A Brief History of Anticipatory Repudiation in American*

*Contract Law*, 69 U. Cin. L. Rev. 565, 619 (2001). The doctrine largely emerged

under Section 2-609 of the Uniform Commercial Code but was expanded in the

Restatement (Second) of Contracts. *Id.* at 623, 629.

Idaho has codified Section 2-609 of the Uniform Commercial Code, which

states: "When reasonable grounds for insecurity arise with respect to the

performance of either party the other may in writing demand adequate assurance of

due performance and until he receives such assurance may if commercially

reasonable suspend any performance for which he has not already received the

agreed return." Idaho Code § 28-2-609. Parties to contracts for the sale of goods,

which are governed by § 28-2-609, may demand adequate assurance of due

performance when reasonable grounds for insecurity arise. *See Magic Valley*

*Foods, Inc. v. Sun Valley Potatoes, Inc.*, 10 P.3d 734, 739 (Idaho 2000) (discussing

and applying Idaho Code § 28-2-609).

But the contract at issue here is not governed by § 28-2-609, nor do

Plaintiffs argue as much. *See* Dkt. 16-1 at 7–9. Instead, Mr. Davis and Ms. Dahl

cite to the Restatement (Second) of Contracts § 251, Dkt. 16-1 at 7–9, which states

in pertinent part:

> (1)  Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.
>
> (2)  The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

Restatement (Second) of Contracts § 251. But Idaho has not adopted the

Restatement (Second) of Contracts § 251 or an analogous doctrine. The Court will

not assume that Idaho would recognize an anticipatory repudiation claim outside of

cases arising under the UCC.nce. *See Olyaie v. GE Capital Bus. Asset Funding*

*Corp.*, 217 F. App'x 606, 610 (9th Cir. 2007) (declining to apply Restatement

(Second) of Contracts § 251 because "no California court appears to have

explicitly adopted that section of the Restatement."). Accordingly, the Court

cannot grant Mr. Davis and Ms. Dahl's motion on this ground. Instead, the Court

will apply Idaho's law of anticipatory repudiation as articulated most recently by

*Tricore Invs. Ltd. Liab. Co. v. Estate of Warren*, 485 P.3d 92 (Idaho 2021).[12]

### 2. Express Repudiation

Plaintiffs argue that Blast repudiated the Contract because of a "positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time." Dkt. 16-1 at 9. The Court will grant Plaintiffs' motion on this ground, finding no triable issues of material fact and that Plaintiffs are entitled to judgment as a matter of law.

Idaho defines anticipatory breach of contract as "a repudiation by the promisor of his contractual duty before the time fixed in the contract for his performance has arrived." *Trumble v. Farm Bureau Mut. Ins. Co.*, 456 P.3d 201, 215 (Idaho 2019) (quoting *Swafford v. Huntsman Springs, Inc.*, 409 P.3d 789, 793 (Idaho 2017)) (cleaned up). To repudiate, a party must make a "positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time." *Tricore Invs. Ltd. Liab. Co. v. Estate of*

---

[12] This approach is in line with Ninth Circuit precedent. *See Kirkland v. Legion Ins. Co.*, 343 F.3d 1135, 1141 (9th Cir. 2003) ("[T]he [Plaintiffs] have not cited, and we have not found, any Oregon court that has cited, or relied on, this section of the Restatement. While failure to give adequate assurances is a repudiation in commercial sales contracts, Or. Rev. Stat. § 72.6090, this case does not involve a commercial sales contract. Instead, the law of anticipatory repudiation in executory contracts is controlled by *Swick* [*v. Mueller*, 238 P.2d 717 (Or. 1951)]. *Swick* must govern our decision, not the Restatement.").

*Warren*, 485 P.3d 92, 112 (Idaho 2021) (internal quotations omitted). The party's language "must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." *Id.* (quoting *Trumble*, 456 P.3d at 216).

But, not all statements of repudiation are actionable. *See Trumble*, 456 P.3d at 216–17 (citing Restatement (Second) of Contracts § 250 (1981)). Instead, the threatened breach must be sufficiently serious that, if the breach actually occurred, it would of itself give rise to a claim for total breach. *Id.* (citing Restatement (Second) of Contracts § 250 cmt. d).

In *Tricore*, the plaintiff-buyer and defendant-seller entered into a purchase and sale agreement (the "PSA") for several parcels of waterfront property. 485 P.3d at 103. The buyer apparently misunderstood the contours of the property covered by the PSA, which led to a series of negotiations between the parties in an effort to keep the deal from collapsing. *Id.* at 104. Despite being under contract, the seller entered into another purchase and sale agreement with a third party for the same property. *Id.* Litigation ensued. *Id.* at 105.

As a defense, the seller argued that the buyer repudiated the PSA by attempting to renegotiate its terms after misunderstanding the scope of property being sold under the agreement. *Id.* at 112. On appeal, the Idaho Supreme Court rejected this argument: "[the buyer's] actions in attempting to renegotiate the

original contract were not 'sufficiently positive to be reasonably interpreted to mean that [the buyer would] not or [could not] perform.'" *Id.* at 113 (quoting *Trumble*, 456 P.3d at 216). The Court further explained that the buyer "[o]ffering a counterproposal after an agreement [had] been reached does not amount to a repudiation[,]" and that "such ongoing discussions are simply that—discussions—which, without more, do not come close to" an unconditional statement of repudiation. *Id.*

In this case, Mr. Davis and Ms. Dahl highlight several statements and actions that they allege amounts to a repudiation as a matter of law. Dkt. 16-1 at 6. They argue that the following—either collectively or individually—amount to a repudiation of the Contract: (1) on May 5, 2021, Mr. Bosier stated that Blast would not construct the house with the contractually agreed upon upgrades; (2) later that day, Mr. Bosier informed Mr. Davis that he was instructing the escrow company, his real estate agent, and his office to cancel the Contract immediately and return the deposit; (3) that same day, Mr. Bosier, on behalf of Blast, executed and transmitted to Plaintiffs an agreement to terminate the Contact; (4) on May 6, 2021, Blast's attorney advised Plaintiffs that Blast considered the Contract settled and it would not alter that position. Dkt. 16-1 at 6. Although the first three statements or actions by Blast are insufficient, the Court finds that the fourth

statement amounts to a repudiation as a matter of law.

As to the first statement, Mr. Bosier's email stating that Blast would not construct the home with Plaintiffs' electrical upgrades is not a repudiation because this would not "itself give the [Plaintiffs] a claim for damages for total breach." *Trumble*, 456 P.3d at 215–16 (citing Restatement (Second) of Contracts § 250) (cleaned up). The Restatement's rendition of anticipatory repudiation, which Idaho has adopted,[13] allows for repudiation only when the threatened breach is sufficiently serious. *See* Restatement (Second) of Contracts § 250 cmt. d; *see also Trumble*, 456 P.3d at 216. Although the electrical upgrades were certainly a sticking point between the parties, *see, e.g.*, Dkt. 16-11 (back-and-forth over electrical upgrades), their exclusion would not have given Plaintiffs a claim for damages for total breach. *Cf. Hull v. Giesler*, 331 P.3d 507, 516 (Idaho 2014) ("A material breach of contract 'touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'") (internal citation and quotation omitted); Restatement (Second) of Contracts § 250 cmt. d, illus. 9. Thus, Plaintiffs are not entitled to summary judgment on this theory of repudiation.

---

[13] *See Trumble v. Farm Bureau Mut. Ins. Co.*, 456 P.3d 201, 215–16 (Idaho 2019) (citing Restatement (Second) of Contracts § 250 and quoting language from the rule and comments); *see also Tricore Invs. Ltd. Liab. Co. v. Estate of Warren*, 485 P.3d 92, 113 (Idaho 2021).

Mr. Davis and Ms. Dahl's second and third claims both fail for the same reason. Mr. Bosier's instruction to the escrow agent and execution of the RE-20 Contract Termination amount to a counterproposal, which *Tricore* forecloses as a possible repudiation.[14] *Tricore*, 485 P.3d at 113 ("Offering a counterproposal after an agreement has been reached does not amount to a repudiation."). Under Idaho law, discussions, and even offers to modify the underlying contract, do not amount to repudiation. *Id.* Thus, Plaintiffs' motion for summary judgment is also denied under this theory.

However, a different conclusion is required for Mr. Johnson's email to Mr. Singler.  Acting on behalf of Blast, Johnson's email to Singler informed him unequivocally that Blast considered the Davis Email a settlement of the issues surrounding the Contract. Dkt. 16-5 at 2. He further explained that "Blast will not take a different position than that with respect to the past contract." Dkt. 16-5 at 2. This statement by Mr. Johnson, especially considering what had transpired between the parties in the preceding days, is a positive, unconditional, and

---

[14] Blast's alleged settlement agreement is incomplete as a matter of law. *See* discussion *supra* Sections A.1, A.2. Thus, Blast's instructions to the escrow agent and execution of the RE-20 Contract Termination were likely an offer to cancel the Contract. *See supra* note 5 and accompanying text. But Mr. Davis and Ms. Dahl never accepted this offer. Dkt. 24-1 at 3; Dkt. 16-3 at 3.

unequivocal declaration of fixed purpose not to perform the contract that warrants summary judgment on the issue of Blast's breach.

This statement stands in stark contrast to statements that Idaho courts have held insufficient. *Tricore*, for example, is readily distinguishable. As explained, the alleged repudiator in *Tricore*—the plaintiff-buyer—was simply negotiating with the defendant-seller, which the Idaho Supreme Court held could not amount to a repudiation, "without more." 485 P.3d at 113. The critical difference here: there *was* more. By stating unequivocally that "the issues surrounding [the] [C]ontract [were] resolved and settled[,]" and further stating that "Blast will not take a different position than that[,]" Blast repudiated the Contract as a matter of law. Dkt. 16-5 at 2; *Tricore*, 485 P.3d at 112 (internal quotations and citation omitted) ("A repudiating party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform.").

### a.  Good Faith Exception

By relying exclusively on the purported settlement agreement, Blast put all its eggs in the settlement-agreement basket. *See* Dkt. 22 at 9–10 ("[Plaintiffs' repudiation] claim is based entirely upon Blast's reliance upon the settlement agreement entered on May 5, 2021."). Aside from arguing the claim was settled, Blast does not offer the Court any reason—be it argument or authority—to deny

summary judgment on the repudiation issue.

Still, the Court recognizes that some jurisdictions provide for a "good-faith" exception when a party repudiates a contract based on an erroneous but good faith view of its rights. *See, e.g.*, *Lansing v. Carroll*, No. 11 CV 4153, 2016 U.S. Dist. LEXIS 98877, at *42–45 (N.D. Ill. July 28, 2016) (exploring, but ultimately rejecting, a "good-faith" exception to repudiation). The Court's own review has not yielded any Idaho authority directly addressing this issue. Nevertheless, Idaho's adoption of the Restatement (Second) of Contracts § 250 persuades the Court that Idaho law does not recognize a good-faith exception in this context. *See Trumble*, 456 P.3d at 215–16 (citing Restatement (Second) of Contracts § 250 and quoting language from the rule and comments); *see also Tricore*, 485 P.3d at 113.

The Restatement explains that "[g]enerally, a party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his duty." Restatement (Second) of Contracts § 250 cmt. d. Numerous well-regarded contract treatises embrace the same view.[15] Because Idaho has adopted the

---

[15] *E.g.*, 10 Corbin on Contracts § 54.15 ("It should make no difference . . . that the contractor believed that he had been discharged, or that the contract was never valid, or that some condition precedent had not been performed. His declaration is a total breach, if it is in fact his duty to render performance and he declares it to be his intention not to render that performance."); 13 Williston on Contracts § 39:40 (4th ed.) ("[T]he existence of a good faith dispute will not (Continued)

Restatement (Second) of Contracts § 250, and because other authority rejects a good-faith exception in this context, the Court finds that a grant of summary judgment to Mr. Davis and Ms. Dahl on the issue of Blast's repudiation is proper.

In sum, Plaintiffs' motion for summary judgement on the issue of Blast's repudiation is granted. Blast, through its attorney, made a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the Contract as a matter of law. Blast's reliance on the unenforceable settlement agreement was misplaced, even if it was in good faith, because Idaho does not recognize such an exception.

## C.    Specific Performance

Mr. Davis and Ms. Dahl have also moved for summary judgment on their First Cause of Action for Specific Performance of the Contract. Dkt. 16 at 2. The Court does not see any genuine dispute of material fact as to what documents make up the Contract. *See* Dkt. 16-2 at 2; Dkt. 11 at 2 (admitting that Blast executed the documents that make up "the Contract"). Further, neither party points to a material fact in dispute relating to the Contract. *See* Dkt. 16-2 at 7 (agreeing the Contract

---

prevent a statement from serving as a repudiation . . . ."); 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.21 at 561 (2004) ("[A] party's good faith will not prevent [his] statement from amounting to a repudiation.").

includes stucco siding for the home); Dkt. 22-1 at 4 (characterizing all the contents of Addendum 3 as "requests for contract modifications" except the plumbing and electrical for the removed pool) Dkt. 22-14 (Addendum 3) (request to modify Contract to remove hand drawn electrical upgrades and heated floors from plans).

However, the lack of a dispute about the terms of the parties' contract does not dictate whether specific performance is appropriate. It is true that a party is generally entitled to the equitable remedy of specific performance in a land sale contract because of the perceived uniqueness of land. If this case just concerned a land sale contract, the Court would have little reluctance to order specific performance of the parties' agreement. But the contract here involves the construction of a residence on that property. Indeed, the parties' dispute focuses on the method, quality, and timing of that construction project. There is precious little dispute about the location, boundaries, or physical features of the underlying real property. Ordering specific performance of a construction contract raises issues which are far more complex and far less amenable to summary adjudication than ordering specific performance of a land sale contract.

Moreover, "the appropriateness of specific performance as relief in a particular case lies within the discretion of the trial court." *Perron v. Hale,* 198 Idaho 578, 582, 701 P.2d 198, 202 (Idaho 1985). The Court is simply unwilling to

exercise its discretion on an issue as complex as granting specific performance of a construction contract without a fully developed record. For that reason, summary judgment is inappropriate on the Plaintiffs' First Cause of Action.

## ORDER

**IT IS ORDERED that:**

1.  Plaintiff's Motion for Partial Summary Judgment as to Defendant's 6th Affirmative Defense (Dkt. 16) is **GRANTED**.

2.  Plaintiff's Motion for Partial Summary Judgment as to the issue of Blast's breach by repudiation (Dkt. 16) is **GRANTED.**

3.  Plaintiff's Motion for Partial Summary Judgment as to the issue of Plaintiff's entitlement to the equitable remedy of specific performance (Dkt. 16) is **DENIED.**

DATED: January 4, 2022

B. Lynn Winmill
U.S. District Court Judge